**TEMPLE ELECTRIC SUPPLY, INC. et al., Appellants,**

v.

**Hobert SIMMONS et al., Appellees.**

No. 10693.

Court of Civil Appeals of Texas.

Austin.

Nov. 4, 1959.

Rehearing Denied Nov. 25, 1959.

Folley, Snodgrass & Calhoun, Amarillo, and Lee Curtis, Belton, for appellants.

Naman, Howell, Smith & Chase, J. Rodney Lee, Waco, for appellees.

HUGHES, Justice.

This suit was brought by appellants Temple Electric Supply, Inc., James R. Wallis and wife, Virginia Ann Wallis and Perry H. Wallis and wife, Evelyn Mae Wallis, against Hobert Simmons and wife, Elizabeth Simmons, and C. L. Walker, Jr. and wife, Iladene Walker, appellees, to recover the sum of $32,967.19 [1] allegedly due them under the provisions of a contract entered into between the parties other than the corporation on the 31st day of May, 1957, whereby the appellees agreed to sell and the Wallises agreed to buy all of the Capital Stock of the Temple Electric Supply, a private corporation and the immediate predecessor of the appellant corporation. The features of this contract, important here, are:

The purchase price to be paid by the Wallises was $75,000, $15,000 of which was paid in cash, the balance being represented by two promissory notes executed by the Wallises each in the sum of $30,000 one payable to the order of appellee Hobert Simmons and the other to appellee C. L. Walker, Jr. These notes were payable in monthly installments of $483.15, principal and interest, and to secure the payment of which the Wallises pledged all of the stock which they had purchased.

The contract gave to appellees the right to inspect the books and accounts of the corporation or its successor during the time the purchase money notes were unpaid.

The controversial portion of the contract, paragraph IV, we quote:

"Seller agrees to be and remain liable for any and all salaries, accounts payable and taxes of all class or character incurred and accrued to date of the effective date of this instrument

1. This amount was alleged to be somewhat larger and other recovery was also sought but this sum is the amount in issue on this appeal.

and Purchaser shall be liable for all of the same incurred and accrued subsequent to the effective date hereof."

The effective date of the contract was May 31, 1957. It is undisputed that the total accounts payable by the corporation on this date was $32,967.19.

Appellees answered the suit by pleading that John B. Daniel, Jr., a practicing attorney at law in Temple, Texas, had been requested to draw the contract herein referred to by the parties to it and that:

"* * * there was no agreement whatsoever that the defendants should be liable for the debts of the corporation, the stock of which was being sold, and that if the·provision in the contract set forth in Plaintiffs' Amended Petition should be held subject to the interpretation that the defendants were so liable, then these defendants say that such provision and obligation were embodied in said writing wholly through the inadvertence and mistake of the scrivener or draftsman of said writing, * * *."

Appellees further pleaded that:

"* * * the inclusion of said provision in said writing was wholly due to a mutual mistake, and that neither said plaintiffs nor these defendants intended by their agreement, above referred to, to create or impose said claimed liability on said defendants to pay the debts of said corporation, and that the inclusion of said provision was due to a mutual mistake of all of the parties to said writing."

The case was tried to a jury and in response to special issues submitted to it the jury found (a) that paragraph IV of the contract, supra, was not included by mutual mistake of all the contracting parties (b) that Mr. Daniel was acting as attorney for all the parties to the contract in preparing it and (c) that he did not insert paragraph IV in the contract by mistake.

Appellants moved for judgment on the verdict and appellees moved that the jury's findings (a) and (c) be disregarded and judgment rendered for them. Appellees also moved for judgment notwithstanding the verdict.

Appellants' motion was overruled and appellees' motions were granted, the first of which being granted on the ground that the jury finding that John B. Daniel, Jr. did not insert the controversial provision of the contract in the contract by mistake was without any evidence to support it but that the contrary was shown by the undisputed evidence and since the jury had made a valid finding that Mr. Daniel was acting for all contracting parties in preparing the contract, appellants were not entitled to recover.

In the view we take of the case it is not necessary that we discuss the grounds upon which the Trial Court sustained appellees' motion for judgment notwithstanding the verdict.

We are of the opinion that the Trial Court correctly granted appellees' motion to disregard the jury finding that the provision of the contract in question was not inserted in the contract by the mistake of the scrivener and to render judgment in their behalf because the contrary of such finding was conclusively established.

The rule of law to be applied is stated in 76 C.J.S. Reformation of Instruments § 25, pp. 352–353 as follows:

"It has been broadly declared that equity will assume jurisdiction to reform a written instrument where there has been a mistake on the part of the scrivener, and that equity has power to reform an instrument to correct a mistake of the scrivener. Equity may reform an instrument where, as a result of mistake, error, or misprision on the part of the scrivener or draftsman, it fails to conform to, or speak, the real or actual agreement between the parties, and this

rule has been applied no matter how the mistake occurred."

This is the rule in Texas as shown by the following excerpt from Bates v. Lefforge, Tex.Com.App., 63 S.W.2d 360, 362:

"The undisputed evidence shows that in the making of the lease contract, the lessee Lefforge through Holman, his agent, agreed to pay for the street improvements, if any were made during the life of the lease, and if the attorney who drew the contract mistook its terms so that the writing did not represent the real agreement of the parties, there was such a mutual mistake as entitled the plaintiff, Bates, to a reformation of the contract expressive of such real agreement. Kelley v. Ward, 94 Tex. 289, 60 S.W. 311, 313. In said case Judge Williams quotes with approval from Albany City Savings Institution v. Burdick, 87 N.Y. 40, the following: 'It is the general rule that where a written instrument fails to conform to the agreement between the parties in consequence of the mutual mistake of the parties, however induced, * * * a court will reform the instrument so as to make it conform to the actual agreement between the parties,' and where the testimony is undisputed as to the circumstances the question then becomes a question of law for the court. Turner v. Montgomery, Tex.Com.App., 293 S.W. 815."

Mr. Daniel freely admitted his mistake in inserting the words "accounts payable" in the contract. He attributed this mistake, principally, to the use of a form and, as he testified: "I used too much of it."

Mr. Daniel testified that none of the parties to the contract had ever discussed with him the assumption by appellees of the accounts in suit at any time during the preparation and execution of the contract and that he first learned of appellants' claim of such liability some six months after the contract was executed.

Lending conclusive support to the testimony of Mr. Daniel is the unequivocal conduct of appellants to which we will now refer.

All contractual parties knew, when the contract was executed, that there were outstanding accounts payable of the Temple Electric Supply of $32,967.19, yet the contract provided that appellants were to execute $60,000 in notes for the deferred purchase price, payable in monthly installments. These installments were paid by appellants during the period appellants were paying and in fact did pay in their entirety the accounts payable of Temple Electric Supply.

When questioned about this obvious inconsistency appellant James R. Wallis testified:

"Q. Now, Mr. Wallis, in June when you had to meet all of these bills did you tell Walker and Simmons that you wanted them to pay that? You were sending out, about in June and July, you mailed out checks of eighteen, of approximately sixteen or eighteen thousand dollars and you were asking these creditors to be patient with you, and you are saying now that Walker and Simmons agreed to pay those, to be and to remain liable for those debts? Did you call on Walker or Simmons, we will say on the first day of July, and say, I want my money because I have to pay these debts?

*   *   *   *   *   *

"Q. I am just asking if you said that to Mr. Walker or to Mr. Simmons? A. No. I felt that I had no reason to ask for my money then.

"Q. You were paying them $833.00 each month, were you not? A. Yes, sir.

"Q. Did you say, wait a minute, you all owe me $32,000.00, and I have already paid out $18,000.00 and I am going to hold up those payments on

that note. Did you say that? A. Well, do you want to know my thinking on it?

"Q. No, sir, I don't want to know what you are thinking, just what you said. A. I did not ask them for the money.

"Q. All right. Come the first, that was the first of June, I mean come the first of July, and then came the first of August, and you paid them more, did you ask Walker or Simmons to make good on an obligation that you say you had with them? A. No, we did not ask them until we paid them off.

"Q. Come the first of September, did you ask them? A. No, sir.

"Q. Come the first of October, did you ask them? A. I think I can shorten it. We asked them around the first part of December.

"Q. Yes, sir. A. Or may be a little earlier, I am not too sure.

"Q. And every month during that time you were paying Walker and Simmons $833.00? A. Plus interest, yes, sir.

"Q. $833.00 plus interest? A. Yes, sir.

*   *   *   *   *   *

"Q. Well, after you had paid in June and July $18,000.00, why didn't you go down and say, Mr. Simmons, Mr. Walker, credit my note with $18,-000.00? You would have stopped the interest then on the 1st day of August or at least on $18,000.00? A. We hadn't paid them all.

"Q. Will you answer why you didn't do that, please? A. I had not paid all of the debts, sir.

"Q. And that is the only reason you give, although you know that during June and July you had paid approxi-mately eighteen thousand dollars and that you did not know, you had no reason in the world, I believe you said, and nobody could have convinced you, but that if you had gone down and talked with Walker and Simmons and told them that you had paid $18,000.00 that they would not have given you credit on your note, and notwith-standing that you continued to pay them $833.00 a month including in-terest, during all of that time, when you say that you thought all that you had to do was to go down and tell them that you had paid this debt and they would give you credit. Now can you explain that, please? A. Why I didn't do it?

"Q. Yes. A. Is that the idea?

"Q. Yes. A. We had made up our minds to approach them when we had completely paid all of the debts and let one transaction take care of the whole deal. I could see very little reason every time I would write a check to run down there just to save this interest because that interest was not particularly bothering me. It was not a great amount as it would accrue for that period. I mean it would not have put me in the poor house to have paid it.

"Q. Well, you don't mean that you just intended to pay interest to Walker and to Simmons which you could have saved? You don't mean that you were just giving them that interest just because the interest was not very high? It is true that it was not but five percent, but you don't mean that you were just willing to give them that interest? A. Well, I will put it this way.

"Q. Yes, sir. A. The interest did not cross my mind."

As shown in the above testimony appel-lees were never requested, prior to their

payment by the Wallises, to pay the accounts payable. The same witness testified:

"Q. Did you inform Mr. Simmons or Mr. Walker that you were paying those accounts. A. Mr. Simmons was aware of it. I told him sometime in June or July.

"Q. What was his statement to you or what was his comment? A. I don't recall his exact comment. It was something like, that is fine, or you are doing well, or something like that."

Shortly after the Temple Electric Supply had been dissolved and the new corporation, Temple Electric Supply Co., Inc., had been organized the following letter was sent by appellant James R. Wallis to some of the creditors of the old corporation:

"Temple Electric Supply—Temple, Texas J & M Appliance Co., Box 10071, Dallas, Texas
"Gentlemen:
"My brother, Perry Wallis, and I are new owners of the Temple Electric Supply Co., Inc., and would welcome a visit from you or any member of your company at any time.
"We acknowledge our debt to you and ask your patience a while longer. We feel confident that within two or three months we will be able to work everything out. We can assure you that you will receive your money just as soon as it is possible to send it.
"Enclosed you will find a financial statement of Temple Electric Supply, Inc. Our accounts receivable are high; we have a large inventory and collections have been off, as they are with everyone.
"It is unfortunate that this situation had to occur at a time when —— were just getting started in business, but we hope in the years to come, our business relations with you will be on a sounder basis.

"Again let me assure you that you will receive your money just as quickly as possible.
"Yours truly,
James R. Wallis"

It is to be noted that the debt is described as "our debt" and that no reference is made to the obligation of appellees to pay it.

This letter and payment of the accounts of the old corporation without calling upon appellees to pay them are compellingly consistent and exclude the thought that appellees and not the Wallises were to pay those debts.

Appellant James R. Wallis when asked "Why did you make those payments and pay all of those liabilities," answered:

"A. Well, it was in the contract that they would be and would remain liable for them, and they signed the contract, that they would be and remain liable. Well, my only experience in acting with a coroporation or any business would have to be based on my individual experience. If you have money coming in and no place to put it, then it is going to get away from you. We elected, in as much as we owed Mr. Simmons and Mr. Walker some money, and they in turn owed the people that we wanted to do business with some money, then if we paid the people we were doing business with that money, and then they gave us credit against our notes, how much simpler it would be in that way. We would have a good credit rating with the people with whom we wanted to do business. It would be much easier to keep track of, so to speak, and then to it would facilitate one thing that was very important to us. It would then get the balance which we owed Mr. Walker and Mr. Simmons down from the $60,000.00 note to around $25,-000.00. Now, by December of that

year, you will remember, we will have six or seven payments, so actually the balance would have been around twenty one or twenty two thousand dollars. We had a source to refinance the business, a source of money which we could have used in order to have refinanced the business over a long period of time, and thereby could have cut our monthly payments down considerably. Now, when we made that decision to pay them, that was when we started."

This explanation deserves sparse comment. It does not have the ring of plausibility. It does not comport with common prudence in matters of business. It is devoid of substance.

When Mr. Daniel prepared the purchase contract he had before him a letter from Mr. Ray Vance, a certified public accountant, who had audited the affairs of the old corporation for several years. This letter was prepared after a series of conferences between some of appellees and appellant, James R. Wallis. Mr. Vance testified:

"Q. Did the terms and conditions of the trade that was going to be made, was that reflected in that letter, from the conversation and the conferences that you had with James Wallis and Mr. Simmons? A. Exactly."

We quote this letter in full:

"Yarbrough, Vance and Associates
Accountants and Auditors
Temple, Texas—April 25, 1957

"Mr. Hobert Simmons, President,
Temple Electric Supply,
Temple, Texas

"Dear Hobert:

"In connection with your contemplated sale of all the capital stock of Temple Electric Supply, I would like to give you some of my ideas as to how the sale should, or will have to be, consummated.

"First, it is my understanding that the sale will be consummated as follows:

"1. Purchasers to give you $75,000.00 for the stock of the corporation.

"2. Down payment is to be $15,000.00 and a note executed for $60,000.00 payable at the rate of $10,000.00 per annum plus interest at the rate of 5%. The yearly payments will be made at the rate of $833.33 monthly plus interest at 5% on the unpaid balance.

"3. Sellers are to assume the note to Mrs. C. L. Walker, Sr., in the amount of $15,000.00.

"4. Sellers are to retain (or not pay) an account due by them to the corporation in the amount of $10,676.27.

"5. Sellers are to retain two insurance policies with an approximate cash value of $1,758.33.

"I suggest that the excess of $2,565.40 ($15,000.00 less $10,676.27 and $1,758.33) then be considered as an additional capital contribution to the corporation (a paid-in surplus item) by the sellers. Sellers basis for their stock would then be $55,134.82. ($50,000.00 capital stock plus $2,569.42 paid-in surplus at date of incorporation plus $2,565.40 paid in surplus as above.)

"Sellers would be entitled to a long-term capital gain on an installment basis. Total gain would be $19,865.18, and taxes on this gain would be computed on the following:

| | Total Collections | Gross Pft percent | Total Gain to date to rpr | Long-term Gain Taxable |
|---|---|---|---|---|
| 1957 | 20,000.00 | 26,4869% | 5,297.38 | 2,648.69 |
| 1958 | 10,000.00 | 26,4869% | 2,648.69 | 1,324.35 |
| 1959 | 10,000.00 | 26,4869% | 2,648.69 | 1,324.35 |
| 1960 | 10,000.00 | 26,4869% | 2,648.69 | 1,324.35 |
| 1961 | 10,000.00 | 26,4869% | 2,648.69 | 1,324.35 |
| 1962 | 10,000.00 | 26,4869% | 2,648.69 | 1,324.35 |
| 1963 | 5,000.00 | 26,4869% | 1,324.35 | 662.16 |
| | 75,000.00 | | 19,865.18 | 9,932.59 |

"The above schedule assumes that no seller will be in such a bracket that the alternative method of computing taxes would apply. Each seller would report his prorata share of the above on his individual tax return.

"As to the purchasers, I suggest that immediately upon purchase of the stock that they liquidate the present corporation by the exchange of their stock for the assets (net) of the corporation. If this is done immediately there should be no question of a capital gain or loss by the stockholders, because if the assets are the real object of the purchase, the price of the stock just purchased will be fixed accordingly leaving little room for a differential between the price paid for the stock (including the assumption of liabilities) and the fair market value of the assets. If there is conclusive proof to the effect that the purchaser's intention was to buy the assets and that he acquired the stock only as an inevitable means to that end, he will be treated as though he had bought the assets. This means that there is no liquidating gain or loss to the stockholder, if the liquidation proceeds with reasonable speed. It also means that the assets take as their basis in the hands of the stockholder the purchase price of the stock.

"Purchasers, as I understand it, then want to form another corporation by exchanging their assets acquired in liquidation for the stock of the new corporation. The problem then arises as to how much to capitalize the new corporation for and as to who is to pay the $60,000.00 note to sellers. If the new stockholders wish to incorporate for $75,000.00, the note to sellers would be assumed by the stockholders as individuals. Payments on the note, if made by the corporation, would then probably be considered as dividends to the individual stockholders. The only other alternative would be to fix the salaries of the stockholders-owners so that they could make the monthly payments as individuals. Either way, the amount paid would be ordinary income to the stockholders-owners. However, dividends would not be deductible to the corporation while salaries, or bonuses, or commissions, if reasonable, would be.

"In my opinion, it would be better to incorporate for a lower amount and let the new corporation assume the $60,000.00 note. It is my understanding that the buyers intend to let the business pay the note to Simmons and others. If so, then the new corporation should be capitalized for approximately $15,000.00 and the remaining other assets be transferred for and in consideration of the assumption of the corporation of the $60,000.00 note.

"The fixed assets of the new corporation will have to be revalued according to the values placed upon them at the time of the original purchase of stock and subsequent liquidation. This transaction should not present any particular problems.

"I have tried to give you here as briefly as possible my recommendations for effecting the transaction and the possible tax consequences that might arise in connection therewith. Please call me at any time for further explanations or discussions pertaining to this matter."

It is to be noted that Mr. Vance stated in the above letter that appellees in the sale of their stock on the terms specified would receive a long-term capital gain of $19,865.-18. This matter was discussed in the presence of appellant James R. Wallis.

On the trial Mr. Vance testified:

"Q. Now, when you computed that gain of nineteen thousand dollars on that basis if Mr. Wallis or anyone connected with him had told you that the deal was for Walker and Simmons to pay $32,967.19, then what would have been their capital gain? A. They would have had a loss.

"Q. What would have been the amount of the loss? A. Approximately $13,000.00.

"Q. How did you arrive at that loss? How would you arrive at their

loss? A. Their cost would have been increased by $32,000.00.

"Q. Instead of the cost of $55,000.-00 it would have cost them that plus the $32,967.19 and the $75,000.00 would have had to be deducted from that, and they would have suffered a loss? A. That is correct.

"Q. A capital loss? A. Yes, sir.

"Q. Is that correct? A. Yes, sir, that is correct.

"Q. And in good accounting practice if it had been told to you by any of these men in any of these conferences, would you as an accountant, and in accordance with standard accounting practices, have computed a capital gain of $19,000.00? A. I could not possibly have.

"Q. What would you have shown if they had told you that was the agreement? A. I would have shown their loss."

It is also to be noted that this letter provided for appellees to assume payment of a $15,000 note which the old corporation owed Mrs. C. L. Walker, Sr. The record shows that this note was paid by appellees. The mention of this obligation, its assumption and payment by appellees is strong evidence that no agreement existed that appellees should assume and pay the accounts in question.

Mr. Vance audited the books of the old corporation for the year ending May 31, 1957, and a copy of this audit was furnished appellants. This audit showed current liabilities of $32,967.19, the subject matter of this suit.

In accordance with the plan outlined in the letter of Mr. Vance the old corporation was dissolved after the transfer of the stock by appellees to the Wallises, a new corporation formed and the assets of the old corporation transferred to it by the Wallises.

Mr. Vance also prepared an audit of the new corporation as of June 1, 1957, and this audit showed that the identical current liabilities of $32,967.19 of the old corporation were set up as current liabilities of the new corporation.

Mr. Vance testified that such liabilities would not have been included as liabilities of the new corporation if in fact they were the debts of appellees.

On the balance sheet of the old corporation its fixed assets were shown at a value of $6,014.19. This was a book value and was the result of depreciation taken for tax purposes over a period of years.

These same fixed assets were shown on the balance sheet of the new corporation to have a cost value to appellants of $34,835.67. Mr. Vance testified:

"Q. As an accountant, and as an accounting principle, would the depreciated value necessarily mean what the actual value was? A. Well, it will hardly ever do that.

"Q. The actual value might exceed to some extent or to a large extent the depreciated value, is that not correct? A. Oh, yes.

"Q. So that you brought over into the new corporation, or rather you set up in the new corporation, that same item that was carried at a depreciated value of some six thousand dollars, and you brought it up to $34,835.67, didn't you? A. That is correct.

"Q. A difference of about twenty eight thousand dollars? A. That is correct.

"Q. Now, did you discuss that with Mr. James Wallis? A. I did.

"Q. To what extent? Now, just tell what you said and what he said about that.

"Mr. Curtis: I would like to know when these conversations took place.

"Q. I mean at the time between May 31st and the time you gave him that report. A. When I started to prepare this new balance sheet I asked Mr. Wallis to come to my office, and I explained to him that on the basis of what I understood to be their trade, that we had $34,835.67 to allocate to the cost of the fixed assets. We sat in my office and assigned values to the various categories of fixed assets. I explained to him approximately what each category of fixed assets would carry as depreciation and what the net effect of it would be as a deductible tax expense throughout the year.

"Q. Now, as to the values and separating them between the building and the other matters, did Mr. Wallis give you those figures or did he acquiesce in those figures? A. Well, we worked them out together.

"Q. You worked them out together? A. Yes."

The evidence shows that the value of $26,835.67 assigned to the building, one of the fixed assets, in the audit of the new corporation has been used by the new corporation for income tax purposes.

The Trial Court permitted some of the parties, on each side, to testify to their intentions regarding the payment of the debts in question. These intentions were all self serving and we need not repeat them here.

The only tangible testimony offered by appellants to rebut the avalanche of evidence supporting the issue of the scrivener's mistake is found in the following testimony of appellant James R. Wallis:

"Q. Now, Mr. Wallis, prior to the 27th day of May, correction, the 31st day of May 1957, or during that month of May of 1957, let me put it that way, was there any discussion with Mr. Simmons in regard to the accounts payable of that business? A. There was.

\* \* \* \* \* \*

"Q. I believe my last question was to state what the conversation was with Mr. Simmons in respect to the accounts payable in the month of May of 1957. A. After having been employed in the store and working in there, and of course we were contemplating the sales, we took a rough tape of the accounts payable as reflected by the books sometime during the month of May. Well we felt—

"Q. Now, not what you felt, but what conversation did you have with Mr. Simmons about that? A. We told Mr. Simmons that under no circumstances would we buy this inventory twice.

\* \* \* \* \* \*

"Q. What was Mr. Simmons' answer to that, Mr. Wallis? A. That not to worry about it, that he would take care of it.

"Q. Was any further conversation had with him about it during the month of May? A. He was informed twice that we would not pay for the inventory twice. At both times he said that he would take care of it.

"Q. What did you understand him to mean when he said that?

\* \* \* \* \* \*

"A. I understood his answer to mean, as was reflected in the contract, that they would be and remain liable for these accounts payable or all of these accrued taxes, salaries and accounts payable that the corporation had at that time on May 31st.

"Q. Was this conversation that you have testified to had on more than one occasion or was it just on one

occasion? A. It was had on two occasions.

* * * * * *

"Q. Would you answer the last question as to how long before May 31st it was that these conversations took place? A. One was along in the middle of May and one was in the latter part of May."

Appellant Mr. Perry Wallis on cross examination testified:

"Q. And that was the agreement all along, wasn't it? That you did not want to pay for the inventory twice and that you were not going to pay for it twice, is that right? A. Yes, sir.

"Q. Now, let's see if you paid for the inventory twice, Mr. Wallis. A. Okay.

"Q. I believe it has been demonstrated while you were sitting here that this is the balance sheet for the new corporation, is that right? A. Yes, sir.

"Q. And that is cash $4,244.00, is that right? A. Yes, sir.

"Q. That was transferred from the old corporation? A. Yes, sir.

"Q. Accounts receivable $20,590.00, is that right? A. Yes, sir.

"Q. Inventory of $46,811.89, is that right, transferred in there? A. Yes, sir.

"Q. And those assets were in this new corporation? A. Yes, sir.

"Q. You got them. You had this reserve of $466.88, is that right? A. Yes, sir.

"Q. And then the $28.70, I am not sure what that was. Can you explain it? A. That was insurance.

"Q. Fine. Then you had fixed assets of $34,835.67, is that right? A. That is what they told me.

"Q. Well, that is right, isn't it? A. Yes.

"Q. It is right? A. It is on the balance sheet, yes, sir.

"Q. You had $34,000.00 worth of fixed assets and that is $107,967.19 worth of assets that you got when you purchased that old corporation, when you purchased the stock of that corporation, isn't that correct? A. Yes, sir, and it owed $92,000.00

"Q. $107,967.19, isn't that right? A. Yes, sir.

"Q. If you deduct from that the $32,967.19 what do you come out with? $75,000.00, isn't that right? A. Yes, I guess so.

"Q. If you deduct all of the payable you get $75,000.00, don't you? A. Yes, I guess so.

"Q. And that is what you paid for the corporation, isn't it? Where did you pay for the—just show me where you paid for the inventory twice? Now, you got this many assets with this liability here, and that gives you the $75,000.00 that you paid for it. Now, where did you pay for it twice? A. Now, you are asking me something that I don't know much about.

"Q. You took accounting—A. Just a minute, Mr. Lee.

"Q. Excuse me. A. In the first place I made D in accounting.

"Q. You made what? A. I made D in accounting so that proves I am not much of an accountant. I can't answer your question except for one thing.

"Q. All right. A. The only way I can look at this so that it means anything to me, Mr. Lee, is that we had $46,811.00 worth of merchandise on the floor, which we had to sell to the public. Then we owed $32,900.00 in bills against the merchandise, so as I

942

look at that, it looks to me like we only had $13,000.00 worth of inventory.

"Mr. Naman: You had your receivables and the cash.

"Q. You had the receivables and the cash? You had this many assets? Those were things that you had, $107,-000.00 worth of assets that you actually had, to be offset by $32,000.00 worth of accounts payable, which gives you the $75,000.00. Now, that is what you paid for it. Now, where did you pay for it twice, and that you state was your agreement? A. That is correct.

"Q. That was the agreement all along that you were not going to pay for them twice. Now, where did you? A. I am not an accountant and I just know that we owed for that much merchandise and that the value of the business of the old corporation was $79,000.00 and it owed $32,967.00 for merchandise. Now, that is all I can understand about it. It looked to me like the net worth of the old corporation was $55,000.00 and as I looked at it we were giving them $75,000.00 for a corporation that was worth to them $55,000.00, so as I see it in my mind, we were giving them $20,000.00 which offset those $20,000.00 worth of receivables.

"Q. Now, Mr. Wallis, let me ask you one more thing. I don't think that the jury or myself particularly understands accounting either. A. I don't either.

"Q. In fact, most of us did not even make a D in accounting. A. Well, you had to take it.

"Q. And all I am saying is, and the point I am trying to make is that you admit that you got $107,000.00 worth of assets, approximately $107,000.00 in assets when you bought that old corporation for $75,000.00 A. That is what it was put on the books for.

"Q. And it was offset for $32,000.00 worth of accounts payable, and that means a difference in the assets and the liabilities of $75,000.00, which is the amount that you, your wife, your brother, and your brother's wife, paid for the stock. Now, where did you pay for the inventory twice? A. Just like I explained it to you, sir.

"Q. And that is your explanation? A. Yes, sir, that is my understanding."

The evidence shows that appellants James R. and Perry Wallis worked in the electric company store for about a month before the purchase was made in order to learn the business and in order to decide on purchasing it. During this period they both ordered merchandise which under their contentions they would receive if still in stock after May 31st but for which appellees would have to pay. This illustrates the strangeness of their position and helps to appraise the single bit of testimony upon which they rely.

Of course appellants did not desire to "pay for the inventory twice" and there is nothing in the evidence to show that they have.

If this were a simple transaction to purchase a stock of goods worth $10,000 and there was $10,000 in debts against them then an agreement to pay the value of the goods as well as the debts would be a case of paying the inventory twice.

This is not that kind of a transaction. There was more than a stock of goods involved. There were accounts receivable, cash and fixed assets in addition. The evidence is conclusive, because it primarily consists of the conduct, acts and admissions of the Wallises that the Wallises agreed to pay $75,000 for the net value of appellees' business which was $75,000.

Appellants lay stress on the testimony showing the circumstances under which the

contract was executed. It was open and above board. All parties had copies accessible and they either read one or the contents were explained to them by Mr. Daniel. No objections were registered.

Mistakes may be made with the eyes open as well as with the eyes closed. Proof in one case may be more difficult than in the other but when made the relief is the same.

■ Appellants complain that the jury finding that Mr. Daniel represented all parties to the contract in its preparation is against the weight of the evidence. We disagree.

Mr. Daniel testified:

"Q. Whom were you representing as attorney in drafting all of these papers, Mr. Daniel? A. Well, let me answer that in this way, Mr. Naman, some of the instruments were obviously for the benefit of the seller, some of the instruments were obviously for the benefit of the purchasers. For example, the stock certificates and the resolutions before the sale to the purchasers, all of that was the normal and natural expense of the sellers. After the new transaction had been completed, such matters as the dissolution of the old corporation, and the transfer of its assets to the stockholders, and by the stockholders to the new corporation, and the new corporate charter, and the corporate minutes and by-laws, all of that was properly chargeable to the purchasers. To the extent of this individual contract here, I purported to and did attempt to represent equally the interest of both the seller and the purchaser, and to that end I charged one half of the fee of the preparation of this contract to the sellers and one half for the preparation of it to the purchasers.

"Q. Am I correct then in saying that you were acting as attorney and as draftsman in the preparation of that contract, for all of the parties to it? A. That is correct, yes, sir.

\* \* \* \* \* \*

"Q. Did Mr. James Wallis request you there to draw this contract or acquiesce in your representing him? A. Yes. That was done on the one occasion when he and Mr. Simmons came to my office prior to this.

"Q. What was said then? A. I told him then that all of this other work would have to be done to carry out the purpose and the intent of it. Then he said, is there any reason why you can't represent us both, and I said, no, but I can't do it unless you ask me to, but if that is what you are doing, I will be glad to do it. Let me further state that on that same time and occasion Mr. James Wallis gave me his check for half of the down payment of $15,000.00, that is the $75,-000.00, which I held in my office safe from that time until the actual closing date, which was approximately a month later."

Appellants paid their portion of this expense.

Appellant James R. Wallis testified:

"Q. Now, on that occasion did you employ or authorize Mr. Daniel to represent you in the preparation of any other papers? A. Now, Mr. Daniel, it was brought up in this manner, in as much as he was going to write the contract for Mr. Simmons, and we had agreed with Mr. Simmons that we would pay half of the cost of the preparation of the contract, it seemed logical, when it was impressed upon us, that all of this had to be done at the same time, it seemed that he would be the logical man to go ahead and write the rest of it.

"Q. Did you so agree at that time? A. Yes, I believe I agreed and, well, anyway he did it and I knew it and I did not protest it."

In our opinion the Trial Court has rendered a legal judgment based on sound equitable principles and one which should be and is affirmed.

Affirmed.